**Willard McPHAIL, Petitioner,**

v.

**WARDEN, ATTICA CORRECTIONAL FACILITY, and Robert Abrams, Attorney General of the State of New York, Respondents.**

**No. 81 Civ. 4145 (PNL).**

United States District Court, S. D. New York.

April 2, 1982.

Willard McPhail, Attica Correctional Facility, pro se.

Carl A. Vergari, Dist. Atty., Westchester County, White Plains, N. Y., for respondents.

## OPINION AND ORDER

LEVAL, District Judge.

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was charged in New York Supreme Court with murder in the second degree (two counts), kidnapping in the second degree, and criminal possession of a weapon in the fourth degree. His motion to suppress statements made by him to police officers was denied after hearing.

On November 17, 1975, Petitioner was convicted on all counts. He was sentenced to serve twenty-five years to life on the murder conviction, and zero to fifteen years

for kidnapping. The judgment was affirmed by the Appellate Division; leave to appeal to the Court of Appeals was denied. On July 30, 1980, Petitioner moved to vacate his judgment pursuant to Crim.Proc. 440.10 on the same grounds as this petition. This application was denied; the Appellate Division did not grant leave to appeal.

*Facts*

On October 22, 1974, Petitioner McPhail accompanied four friends to Evander Childs High School in the Bronx, and there helped to force the victim, Anthony Graham, into a rented U-Haul Truck. They proceeded to a rural, residential area where the murder took place. After some, or all, of the men had taken a turn firing a shot at the victim, the body was dumped into a stream and the men drove away.

On October 28, 1974, Detectives Avery and Kralik of the White Plains Police Department went to the Petitioner's home in the Bronx. The detectives entered the apartment and observed petitioner standing in the hallway between two rooms. Detective Avery read petitioner his rights and requested that he accompany them to headquarters. Petitioner agreed and the three proceeded to the 47th precinct. The officers advised McPhail that two other men were under arrest for homicide and that they had information that he was involved with the death of Anthony Graham. During the trip to the police station, petitioner discussed the homicide with the detectives and stated that Graham had "gotten everything he deserved." Petitioner described the incident in detail and supplied the officers with the name of one of the participants.

Later that day, the same officers accompanied McPhail from the 47th precinct to the White Plains Police Headquarters. Petitioner again discussed the shooting with the officers and informed them that he had shot Graham in the arm. These two conversations with the officers were the subject of the Huntley Hearing.

*Discussion*

Petitioner raises four constitutional issues, only one of which warrants extended discussion. Petitioner contends that *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), under which his arrest would arguably have been illegal, should be given retroactive effect on collateral attack.

In *Payton*, the Court held that police may not make a warrantless and non-consensual entry into a home to effect a routine felony arrest. Such an arrest is presumptively unconstitutional and the state has the burden of rebutting the presumption by showing that exigent circumstances existed. In *Riddick v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), decided with *Payton*, defendant Riddick was sleeping in his bedroom when a policeman knocked at his door. Riddick's three year old son answered the door, the policeman entered and arrested Riddick. The Court found that there had been sufficient time to obtain a warrant and that there were no exigent circumstances to justify the warrantless arrest. New York's probable cause standard for warrantless arrests in the home was rejected as a violation of the fourth amendment and Riddick's habeas corpus petition was granted.

Since *Payton*, the Supreme Court has vacated judgment and remanded for reconsideration several cases on direct appeal. *See, Busch v. Florida*, 446 U.S. 902, 100 S.Ct. 1826, 64 L.Ed.2d 255 (1980); *Brown v. Florida*, 446 U.S. 902, 100 S.Ct. 1826, 64 L.Ed.2d 254 (1980); *Vidal v. New York*, 446 U.S. 903, 100 S.Ct. 1826, 64 L.Ed.2d 255 (1980); *Gordon v. New York*, 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 255 (1980). On remand, the state courts have generally viewed the Supreme Court's action as an indication that *Payton* is to be given retroactive application to cases on direct appeal. *See Busch v. Florida*, 392 So.2d 272, 274 (Dist.Ct.App. 1980). *See also United States v. Vasquez*, 638 F.2d 507 (2d Cir. 1980). That court limited its holding to cases on direct review. The Supreme Court has expressed no view as to cases in which the issue is raised on collateral attack after termination of all appeals.

Retroactive application of newly articulated constitutional principles is neither prohibited nor required by the Constitution. *Brown v. Louisiana*, 447 U.S. 323, 100 S.Ct. 2214, 65 L.Ed.2d 159 (1980); *Linkletter v. Walker*, 381 U.S. 618, 629, 85 S.Ct. 1731, 1737, 14 L.Ed.2d 601 (1965). The test employed to determine whether retroactive application is appropriate requires consideration of three criteria: (a) the purpose to be served by the new standards; (b) the extent of reliance by law enforcement authorities on the old standards; and (c) the effect on the administration of justice of a retroactive application of the new standards. *Brown v. Louisiana*, 447 U.S. at 325, 100 S.Ct. at 2218; *Stovall v. Denno*, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967). "Foremost among these factors is the purpose to be served by the new constitutional rule." *Brown v. Louisiana*, 447 U.S. at 328, 100 S.Ct. at 2219 (quoting *Desist v. United States*, 394 U.S. 244, 249, 89 S.Ct. 1030, 1033, 22 L.Ed.2d 248 (1969)).

Where the major purpose of the new doctrine is to rectify a prior practice that "substantially impairs" the truth-finding function and casts doubt upon the reliability of a past finding of guilt, full retroactivity is required regardless of the weight of the burden and reliance factors. *Brown v. Louisiana*, 447 U.S. 323, 100 S.Ct. 2214, 65 L.Ed.2d 159 (1980); *Williams v. United States*, 401 U.S. 646, 653, 91 S.Ct. 1148, 1152, 28 L.Ed.2d 388 (1971) (plurality opinion) (White, J.).

However, the fact that a new constitutional rule in some respects has an impact on fact finding does not require its retroactive application. Assessment of the effect of a forbidden practice on the truth determining process is "necessarily a matter of degree" and a "question of probabilities". *Brown v. Louisiana*, 447 U.S. 323, 100 S.Ct. 2214, 65 L.Ed.2d 159 (1980); *Stovall v. Denno*, 388 U.S. at 297, 87 S.Ct. at 1970; *Johnson v. New Jersey*, 384 U.S. 719, 734, 86 S.Ct. 1772, 1781, 16 L.Ed.2d 882 (1966).

The first question to be addressed is whether *Payton* was directed to a practice which impaired the truth-finding function of the trial court. The *Payton* decision was predicated upon the public's fourth amendment right to be "secure in their . . . houses . . . against unreasonable [and warrantless] searches and seizures."

The requirement of an arrest warrant acts to deter the police from unauthorized and arbitrary uses of force against private citizens, *Payton v. United States*, 445 U.S. at 585, 100 S.Ct. at 1379. The *Payton* decision was clearly intended to expand the ambit of fourth amendment protection from intrusion giving special protection to the privacy of the home. The effect of this decision upon the fact-finding function of the trial court is, at most, incidental. Moreover, as *Payton* is now the law in New York, the deterrence purpose is served and will not be materially furthered by applying *Payton* retroactively to a situation in which the police acted in good faith within the boundaries of the law as it existed at the time. The trial court found, and the appellate division agreed, that the police had sufficient probable cause to arrest McPhail without a warrant, as provided for under existing New York law.

While the primary focus of the Court's discussion of retroactivity is on "purpose", if the purpose is not to "overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so [raise] serious questions about the accuracy of guilty verdicts in past trials", then the other two prongs of the test, good faith reliance and burden on the administration of justice, are applied. *Brown v. Louisiana*, 447 U.S. at 328, 100 S.Ct. at 2219–20 (quoting *Williams v. United States*, 401 U.S. 646, 653, 91 S.Ct. 1148, 1152, 28 L.Ed.2d 388 (1971)).

[T]he holding that a new constitutional principle is fully retroactive also may result in serious costs. Convictions long regarded as final must be reconsidered on collateral attack; frequently they must be overturned for reasons unrelated to the guilt or innocence of the prisoner, and in spite of good-faith adherence on the part of police, prosecutors, and courts to what they understood to be acceptable

procedures. Society suffers either the burden on judicial and prosecutorial resources entailed in retrial or the miscarriage of justice that occurs when a guilty offender is set free only because effective retrial is impossible years after the offense. Reopening a case also carries disadvantages for those who have been convicted:

> "Both the individual criminal defendant and society have an interest in insuring that there will at some point be the certainty that comes with an end to litigation, and that attention will ultimately be focused not on whether a conviction was free from error, but rather on whether the prisoner can be restored to a useful place in the community."

*Hankerson v. North Carolina*, 432 U.S. 233, 247, 97 S.Ct. 2339, 2347, 53 L.Ed.2d 306 (1977) (Powell, J., concurring) (quoting *Sanders v. U.S.*, 373 U.S. 1, 24–25, 83 S.Ct. 1068, 1081–1082, 10 L.Ed.2d 148). See *Mackey v. United States*, 401 U.S. 667, 675–98, 91 S.Ct. 1160, 1164–82, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring and dissenting).

The state court found the police relied in good faith upon the New York law in that they acted when they had probable cause to arrest McPhail. The reliance consideration, though relevant, is not as important or weighty as the burden consideration.

Full retroactivity to cases terminated at the time of *Payton* (as opposed to those which were still on direct appeal, such as the *Busch, Brown* and *Gordon* cases cited above) would impose an unjustified burden upon the New York courts and would seriously harm the public. Important convictions would be vacated without regard to the reliability of the fact finding process, for reasons which would have no influence on future police conduct. The Supreme Court has rejected retroactivity for similar reasons. *See, e.g., Linkletter v. Walker*, 381 U.S. 618, 637, 85 S.Ct. 1731, 1741, 14 L.Ed.2d 601 (1965), *Tehan v. Shott*, 382 U.S. 406, 418–19, 86 S.Ct. 459, 466–67, 15 L.Ed.2d 453, *rehearing denied*, 383 U.S. 931, 86 S.Ct. 925, 15 L.Ed.2d 850 (1966).

None of the considerations which the Supreme Court has found to favor retroactivity is present here. The purpose to be served by the new standards will not be furthered by retroactive application of *Payton* on collateral attack. Moreover, the reliance and judicial economy considerations argue against granting full retroactivity. Assuming that full retroactivity is denied, the state law prevailing at the time of the arrest applies. Under the then-existing New York law, McPhail's arrest was legal if supported by probable cause. The state court found that such probable cause existed and the findings of that court are presumptively valid. 28 U.S.C. § 2254(d) (1976).

Were it not for my conclusion that the *Payton* decision is not intended to apply retroactivity to closed cases raising the matter of collateral attack, I would need to consider two additional questions.

First it is not clear that petitioner was arrested in his home. The testimony at the Huntley hearing and the trial was to the effect that the officers went to his home and asked him to accompany them for questioning and that he agreed to accompany them. In the conduct of police investigations, suspects and witnesses are often requested to come to the police station to answer questions without an arrest taking place. While the questioning sometimes leads to arrest, such persons are also often free to leave. Whether they are to be regarded under law as having been "arrested" may depend on the purpose of the inquiry. If the purpose is to decide whether *Miranda* warnings were due, one might conclude that the circumstances were sufficiently intimidating to require the warning as a matter of law. It does not necessarily follow that *Payton* forbids police officers from making such a request at a suspect's home.

The prosecution conceded, and the Supreme Court special term apparently assumed on the motion to vacate that petitioner had been arrested in his home. However, that assumption is not necessarily con-

trolling. At the Huntley hearing, nothing turned on the question whether he had been arrested. The petitioner had received the advice of rights which "arrest" would require under *Miranda*. The contention was that the statements had been coerced, an inquiry which is in no way influenced by a technical conclusion whether or not he was to be considered under arrest as a matter of law. Thus, were the issue not put to rest by the retroactivity question, a hearing would be warranted into the issue whether petitioner was arrested in the sense condemned by *Payton* if done in the home without a warrant and absent exigent circumstances.

A further inquiry would also arise whether a violation of *Payton*, especially one raised on a retroactive basis, calls for the exclusion of *statements* made by the defendant after arrest. In a case of proper application of the *Payton* rule, it is only the place where the arrest is made that renders it unlawful, and even this unlawfulness would be cured by the procedural observances.

The logical application of *Payton* seems quite different as between the suppression of physical evidence found in the home, the very place whose privacy is protected by the rule, and statements made by the defendant at a precinct house, or in a car, after arrest. In the latter case, the relationship between the aspects of the arrest which render it illegal and the giving of the statement seem fortuitous at best—there being no question that such defendant would have been liable to arrest and the taking of statements had he been found outside his home. *See Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).

In *United States v. Vasquez*, 638 F.2d 507 (2 Cir. 1980), the Court of Appeals did suppress post-arrest statements on authority of *Payton*. That decision does not necessarily, however, set the matter to rest since the issue was not discussed by the Court and since there may be a distinction in that the statements in question were taken in the home.

■ II. Petitioner contends further that the statements obtained between his arrest and his booking were a violation of his right to remain silent and his right to counsel. This issue was decided at a pre-trial *Huntley* hearing in which the court found petitioner had "voluntarily and intelligently" waived his rights. The Appellate Division, Second Department, affirmed these findings and petitioner has not succeeded in establishing any of the statutory exceptions which overcome the presumption of correctness. 28 U.S.C. § 2254(d) (1976).

III. Petitioner contends further that the jury charge violated *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) in that it impermissibly shifted to defendant the burden of proof on the issue of intent. This contention is without merit. The very same language has been found by the Court of Appeals not to warrant relief. *Washington v. Harris*, 650 F.2d 447 (2d Cir. 1981); *Borrello v. Turnello*, No. 81–1760 (S.D.N.Y. Oct. 16, 1981).

■ IV. Finally, petitioner contends that the state's refusal to provide him with transcripts of his co-defendant's trials was a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Brady* does not require the state to provide transcripts of materials which are in the public domain. The material defendant sought was available to the public at the time of his request and therefore his claim of prejudice is without merit.

The petition is denied.

SO ORDERED.